**NORTH AMERICAN PHILIPS COMPANY, Inc.**

v.

**UNITED STATES.**

No. 354–56.

United States Court of Claims.
July 19, 1961.
Rehearing Denied Oct. 4, 1961.

Charles W. Halleck, Washington, D. C., for plaintiff. Arthur J. Phelan and Hogan & Hartson, Washington, D. C., on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

LARAMORE, Judge.

This is a suit for the recovery of alleged termination costs growing out of a contract that was terminated for the convenience of the Government pursuant to the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq.

The contract involved in this case was originally entered into with Philips Laboratories, Inc. However, on July 2, 1954, they entered into an agreement with the defendant whereby the plaintiff herein was substituted as the contractor under the contract.

The facts in this case are set out fully in the findings and will only briefly be related in this opinion.

Towards the end of World War II a Dutch company known as N. V. Philips Gloeilampenfabrieken was engaged in developmental work on an external combustion engine. In September of 1944, after the Germans had been driven out of Holland, an Allied mission went to the Netherlands to obtain technical intelligence on various projects. Reports on the nature of the Philips' developmental work were sent to Washington where they created interest on the part of the Navy's Bureau of Ships. As a result of this interest, the Navy and Philips Eindhoven decided to join forces for the further development of these engines. It was determined that these engines could best be developed in the United States and a new corporation known as Philips Laboratories, Inc., was formed on June 11, 1945, for that purpose. Pursuant to this plan it was agreed between the parties that a group of Dutch technicians and their families, together with special equipment and technical data, would be brought to this country for a period of 18 months. Even though no contract was signed at that time, this group immediately began work at Dobbs Ferry, New York, on the development of the new engine.

Thereafter, following nearly nine months of negotiations, a contract was

entered into on June 19, 1946. This contract was dated June 1, 1946.

During the negotiations, Philips proposed to undertake a cost contract with the Navy which would include task orders for various units of work. It was ultimately agreed that each task order would fall into one of three categories, depending upon the relative commercial and military value of the engine to be developed. The Navy would pay 60 percent of the cost of a task order with high commercial potential, 80 percent of the cost where there was only a moderate commercial potential, and 100 percent of the cost where the end product of a task order had only military potential.

It was intended that the contract would last 10 years. The general provisions of the contract provided that title to all property purchased or produced for use under the contract should vest in the Government. The contract contained provisions whereby Philips would pay 40 percent of the cost under the first three task orders. The contract further provided that the Government must reimburse the contractor, upon termination, for all costs and expenses for which the contractor was to be reimbursed or otherwise compensated under the contract and for which payment had not been made prior to the termination. In the event of such a termination by the Government, Philips was to transfer title (to the extent that title had not already been transferred), and deliver to the Government the fabricated or unfabricated parts, work in progress, completed work, supplies and other material produced as a part of or acquired in respect of the performance of the work terminated, as well as special tools and tooling acquired or manufactured for the performance of the contract.

On September 10, 1946, Task Order No. 1 was issued, and on December 20, 1946, Task Order No. 2 was issued. The spirit and intent of these task orders was stated to be embodied in the Navy letter of intent dated September 26, 1945. These orders, containing special details, called for the development and construction of a new type external combustion engine to be incorporated in a standard generating set. It was estimated that the work would require 20 months of development. However, technical difficulties were encountered, and in February 1947 Philips advised that the work on the first three task orders would run over 27 months.

Due to a limitation on the Navy's funds, as well as some impatience with the progress of the work on Task Orders Nos. 1 and 2, the Navy amended these orders so as to remove electrical generator requirements and permit the work to concentrate on engine development.

On March 12, 1948, Task Order No. 3 was issued and three days later Task Order No. 2 was terminated. However, it was provided that work under Task Order No. 3 should not begin until the first "basic" engineering prototype engine covered by Task Order No. 1 was accepted by the Government. Philips prematurely delivered the work product under Task Order No. 1, which was accepted by the Government on June 1, 1948. The Navy then authorized Philips to proceed with Task Order No. 3. Shortly thereafter, Philips admitted being overanxious on the first engine and requested its return for additional development.

On April 26, 1949, Philips proposed to the Navy that Task Orders Nos. 1 and 3 be terminated and that a fourth task order be issued. In support of this proposal Philips pointed out that the requirements of Task Order No. 1 had been substantially satisfied and that it would be impractical to press for further refinements. As to Task Order No. 3, it was stated that there was no apparent interest in that type of engine. Philips suggested the development of a 1-horsepower engine as the next logical step in the development process. This proposal was rejected by the Government on May 12, 1949.

On October 25, 1949, it was decided that the contract be terminated for the convenience of the Government.

On March 2, 1950, the contracting officer determined that Philips' performance was complete, but disagreements arose

concerning the scope of Philips' termination claim. It is as a result of these disagreements that this lawsuit was instigated. The plaintiff seeks a fair and reasonable amount for its termination costs and expenses.

The plaintiff predicates a claim for recovery on each of four counts: First, an equity in the termination inventory equal to 65 percent of 40 percent of the cost of such inventory. Second, interest on the amount of its claim from the date of the termination of the contract. Third, expenses alleged to have been incurred as a result of the termination of the contract. Fourth, expenses alleged to have been incurred as post-termination expenditures.

We will deal with each of these counts in order. In the first count, the plaintiff contends that it never intended to enter into a contract that provided that it would pay 40 percent of the costs of machinery, materials and equipment which would be required for use during the life of the contract, which was to be for a period of 10 years, give the Government immediate title to those things, and then give the Government the right to terminate the contract at any time thereafter, and thereby obtain a windfall of 40 percent of the costs of those items. The plaintiff recognizes that it did just that, but emphasizes that it is not an equitable situation. This is a reasonable interpretation and we agree with this contention of the plaintiff. However, when the plaintiff applies this sound argument to the facts in the instant case it carries the reasonableness of its position beyond the bounds of propriety.

For convenience the plaintiff's first count may be divided into three distinct claims, as follows: (1) engine models; (2) materials, tools and equipment; (3) capital equipment. Plaintiff lumps the above-mentioned items under the heading of inventory and argues that inasmuch as the contract, which was to run for 10 years with the plaintiff paying 40 percent of the cost, was terminated after three and a half years, their costs should only be 35 percent of the 40 percent. However, when the claim is broken down into these categories it becomes clear that this argument is sound only as to part of the claim. The materials, tools and equipment which are properly labeled inventory are those items which would be used during the course of the contract, other than capital equipment. When the contract was terminated the title to these items vested in the defendant. These items had a specific value at the time of the termination for which the defendant had paid only 60 percent of the costs. As to these items the plaintiff had an equity based on its 40 percent share of the costs. A list of this equipment on hand at the termination of the contract is as follows:

| I | II | III |
|---|---|---|
| Description of material | Value | Amount claimed by Philips as equity |
| Metals in mill product form (tubing, sheets, rods, wire, etc.) ......................... | $4,620.03 | $1,848.01 |
| Tape, belting, paint, plexiglass, etc. .................... | 682.15 | 272.86 |
| Purchase parts (bearings, bushings, inserts, pins, pulleys, rings, valves, and seals) ........................ | 4,779.12 | 1,791.65 |
| Miscellaneous small items (tool boxes, oil cans, baking pans, lettering pens, staplers, etc.) ............... | 691.67 | 276.67 |
| Test meters ................... | 3,744.76 | 1,497.90 |
| Laboratory supplies ........... | 1,329.52 | 533.77 |
| Small tools ................... | 2,722.63 | 1,089.05 |
| Machine tool accessories...... | 959.30 | 383.72 |
| Measuring gauges ............. | 561.33 | 224.53 |
| Special tools ................... | 30,090.43 | 12,036.17 |
| Total ..................... | .......... | 19,954.33 |

Therefore, plaintiff is entitled to recover $19,954.33 based on its equity in the value of the inventory. Only the above-listed material is inventory. The four engines which constitute the basis for the major portion of the plaintiff's claim can hardly be called inventory. As to the engines, the plaintiff has no equity for several reasons. First, there is no basis in claiming that the value of the

engines at the time of the termination of the contract is the cost of the engines. This was a research and development contract for which millions of dollars might be spent but the result be valueless. On the other hand, the more successful the development the less valuable the end product because they were seeking to develop an efficient yet *economical* prime mover. Therefore, if they had been successful, the result would have been an inexpensive engine. Surely, they cannot have a better claim because they were unsuccessful.

Second, the fact that the contract was to run for 10 years is in no manner connected with this part of the plaintiff's claim. The engines were not developed under the general contract but under specific task orders pursuant to the general contract. There is no requirement in the contract which makes it mandatory for the Government to spend a certain amount each year or describes specifically the engines to be developed. It was intended at the time the contract was entered into that the contract itself should broadly cover the developmental work but that details of particular projects should be specified in separate task orders. The equity, if any, that the plaintiff would have would be measured over the life of a particular task order, not over the life of the 10-year contract. Since it was estimated that it would require 20 months to develop the type of engine desired, and plaintiff actually worked on the engines for three and a half years, any equity that the plaintiff might have had was completely exhausted.

Third, a contributing factor leading to the termination of the contract was the plaintiff's dissatisfaction with the terms of the specific task orders and the lack of commercial possibilities for the type of engines being developed. In fact, plaintiff requested the defendant to terminate the two outstanding task orders because it felt that one was substantially developed and the other was of no interest. How then can these engines be of such value

to the plaintiff? Clearly, it is simply an attempt to recoup a substantial amount of the expenses which the plaintiff contracted to incur in the expectation of receiving commercial benefits. Since these commercial benefits did not become a reality, it would appear that the plaintiff entered into a bad bargain, but this can be of no concern here. It would appear that the plaintiff received exactly that for which it bargained. Therefore, the plaintiff is entitled to no part of its claim as to the engines. This is in no way unfair to the plaintiff for it need only be pointed out that the results of research are both tangible and intangible. True enough, the Navy received the physical assets, but the plaintiff retained the "know-how" at a cost of only 40 percent. In other words, plaintiff received 100 percent of the "know-how" with an expenditure of only 40 percent of the costs.

The third part of the plaintiff's first count concerns capital equipment. It should be noted that the determination of this issue is not based on equity but merely follows the terms of the contract as agreed to by the parties.

The pertinent parts of the contract are set out as follows:

"Section 5. (a) Title to property purchased for the performance of this contract and for the cost of which the Contractor is entitled to be reimbursed under this contract shall automatically pass to and vest in the Government upon delivery to the Contractor, or upon the happening of any other event prior to such delivery by which title passes from the vendor or supplier thereof. Title to property not so purchased, but for the cost of which the Contractor is entitled to be reimbursed hereunder shall pass to the Government upon allocation thereof to this contract by the commencement of processing or by use thereof or otherwise. Such vesting of title shall not impair any right which the Government might otherwise have under this contract, and shall not relieve the Contractor

of any of its obligations under this contract.

\* \* \* \* \* \*

"Section 8. (b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination: \* \* \* (6) transfer title (to the extent that title has not already been transferred) and deliver to the Government in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of or acquired in respect of the performance of, the work terminated in the Notice of Termination, (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government, and (iii) the jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for the performance of this contract for the cost of which the Contractor has been or will be reimbursed under this contract: \* \* \*.

■ There is no doubt that this equipment was purchased for the performance of this contract. The plaintiff initially paid the full costs of such equipment and it was intended that the defendant reimburse 60 percent of this expense on a monthly basis spread out over the 10-year term of the contract. In fact, this procedure was actually followed until the contract was terminated. At that time the title to the equipment should have been transferred to the Government, and the plaintiff should have been reimbursed for its unamortized portion of the contract. As a matter of law, title to the capital equipment was in the Government. Therefore, the termination of the contract was an effective means of depriving plaintiff of the opportunity for further use of that equipment during the remainder of the 10-year period of the contract. As a result, the plaintiff is entitled to recover $14,063.94 as its unreimbursed share of the original cost. Defendant, of course, is entitled to the proceeds from the sale of this equipment which is presently being held in an escrow account. It is our determination that the plaintiff is entitled to recover $34,018.27 under the first count in this petition.

■ Plaintiff, in count two of its petition, makes a claim for interest on the amount of its claim from the date of termination of the contract. Plaintiff's entire claim is predicated under the Contract Settlement Act of 1944, supra, as it must be because this action was filed August 13, 1956, based on a cause of action that arose November 7, 1949. If the provisions of this Act do not apply in this instance, then the petition must be dismissed as without the general jurisdiction of this court. 28 U.S.C. § 2501.

■ However, it was the intention of the parties that the provisions of the Contract Settlement Act, supra, would apply, as evidenced by the developments since the contract was terminated. The Supervisory Inspector of Naval Material, New York, in his report indicated that the Act applied. The contracting officer, J. C. Marley, allowed a portion of plaintiff's claim for interest on the basis of the Act. The contracting officer advised plaintiff as late as May 15, 1956, that the provisions of the Contract Settlement Act of 1944, supra, governed this termination claim. The Government concedes in its brief that the interest on the settlement award would be increased proportionately if the court should conclude that plaintiff was entitled to more than it received. Since we do reach this conclusion, it follows that the plaintiff is entitled to interest at two and one-half percent, commencing 30 days after the termination of the contract, as provided under the Contract Settlement Act, supra. However, since the amount of plaintiff's recovery has yet to be determined, it will

be necessary to reserve a determination of the amount of interest until the amount of the claim is determined pursuant to Rule 38(c), 28 U.S.C.

In count three of the petition plaintiff makes claim for expenses allegedly incurred as a result of the termination of the contract.

It is conceded and the commissioner has found as a fact that in the event of recovery under count one of the petition plaintiff will withdraw count three from consideration. However, it is apparent that this concession was made by plaintiff premised on the recovery of the major item of count one; i. e., that defendant took certain engines already developed and plaintiff was deprived of the use of these models in its future development operations. We have not allowed recovery on this item of plaintiff's claim. Consequently, we believe that under these circumstances plaintiff did not intend to waive its claim, and therefore count three is a proper subject for our consideration.

The contract provides that in the event of termination by the Government the contractor shall be paid:

"(1) All costs and expenses for which the Contractor is to be reimbursed or otherwise compensated under this contract and as to which payments have not previously been made to the Contractor for the performance of this contract prior to the effective date of the Notice of Termination and such of these costs and expenses as may continue for a reasonable time thereafter with the approval of or as directed by the Contracting Officer (which approval shall not be unreasonably withheld): Provided, however, that the Contractor shall proceed as rapidly as practicable to discontinue such costs and expenses."

■ It is noted that subsection (1) above provides that approval shall not be unreasonably withheld. We believe that inasmuch as the plaintiff actually paid certain termination costs, it is consistent with this provision that said costs be paid by the Government, and the contracting officer acted beyond the scope and intent of the contract when he denied payment. In other words, failure to approve was unreasonable in the circumstances.

Based on the above, we are of the opinion that plaintiff is entitled to recover the termination expenses which were paid and which were necessary and proper.

In respect to count three, the commissioner has found that if the plaintiff should prevail, the determination of the amount due will require consideration of evidence not in the record, concerning the necessity or propriety of certain expenditures which form the basis of this claim. Therefore, we are remanding this item of plaintiff's claim to the commissioner of this court to determine which items of termination costs were necessary and proper, together with the amount thereof, consistent with the above.[1]

Plaintiff's claim under count four of the petition is for settlement expenses disallowed from its post-termination claim, and includes a claim for expenses incurred in arranging for disposal of a

---

1. Defendant avers in its brief that due to health of witnesses, difficulty of proof due to the lapse of time and the death of witnesses, and in the interest of economy of time and expense, counsel for the respective parties agreed that the Government's files and the plaintiff's files, insofar as they were pertinent, could be turned over to the commissioner in the form of exhibits so that he could produce a set of findings of fact which would eliminate the need of taking testimony in this case, and at the same time be sufficient to present the legal issue.

It is now apparent that enough facts are in the record to present legal issue, but the facts relative to the amount of recovery are not present.

Defendant argues that it would not have consented to the procedure had plaintiff not represented that it would dispose of the entire case. There was no actual separation of the issues, but under the circumstances a separation of issues would be a normal procedure, and we will view the record as if there had been an actual separation of liability and amount of recovery.

part of the capital equipment inventory to Columbia University. The original claim was for $71,457.21 and of this amount $11,904.56 was allowed to plaintiff. However, the balance of the claim was disallowed.

There can be no question that Philips had incurred and paid the post-termination expenses claimed because on May 24, 1954, Philips submitted an invoice to the Navy covering these claimed expenses. The claim was audited and a Navy cost inspector found that all of these costs had been incurred and paid, with the exception of interest and payments contingent upon final settlement. Finally, however, the contracting officer disallowed Philips' claim.

Since we have held that title to the capital equipment was in the defendant, we can see no reason why plaintiff should bear the expense burden of the disposal thereof to Columbia University. Consequently, the court is of the opinion that these expenses are an item for which plaintiff should recover.

We are also of the opinion that plaintiff should recover the post-termination expenses paid which were necessary and proper, for the reason stated in our opinion as to count three of the petition; i. e., that payment therefor was consistent with the contract provisions.

The commissioner has found that the claim under count four will require consideration of evidence not now available in the record and has recommended that the determination of specific amounts and the necessity and propriety thereof be reserved pursuant to Rule 38(c) for a determination consistent with this opinion. Therefore, we are remanding this portion of plaintiff's claim to the commissioner to determine the amount of expenses incurred by plaintiff in the disposal of the capital equipment and a determination of the amount necessarily expended by plaintiff as post-termination expenses.

In summary, it is the determination of the court that the plaintiff is entitled to recover on count one of the petition the sum of $34,018.27. Plaintiff is further entitled to recover under count two of the petition the interest on the total amount of its termination claim, commencing 30 days after the termination of the contract. Plaintiff is further entitled to recover on count three of the petition the necessary and proper expenses actually incurred in the termination of the contract. Plaintiff is further entitled to recover on count four of the petition the necessary and proper post-termination expenses actually incurred.

The case is remanded to the commissioner of this court under Rule 38(c) for a determination of the amount of interest due under count two of the petition, and for further evidence concerning the necessity and propriety of the expenses, and the amount thereof, claimed under counts three and four of the petition.

It is so ordered.

JONES, Chief Judge, and WHITAKER, MADDEN and DURFEE, Judges, concur.